### HORLOCK v. GUARDIAN TRUST CO.
(No. 1238.)

(Court of Civil Appeals of Texas. Beaumont. May 28, 1925. Rehearing Denied June 10, 1925.)

1. **Witnesses** ⬦159(8)—**Claimant against estate for stock delivered to deceased held not competent to testify to terms of contract with deceased.**

Plaintiff, who set up an interest under oral contract with deceased in stock which had been delivered to and held by deceased, and sold by executor of estate, *held* not entitled to testify to terms of contract by which he delivered stock to deceased, under Rev. St. art. 3690.

2. **Executors and administrators** ⬦451(2)—**Evidence sufficient to show oral agreement under which plaintiff retained interest in stock delivered to deceased.**

In action against estate for balance due under alleged oral agreement with deceased, whereby plaintiff retained an interest in corporate stock delivered to deceased, evidence that deceased did not acquire absolute title, but held stock in trust for benefit of plaintiff, subject to future adjustment, without reference to time limited, *held* to present jury question.

Appeal from District Court, Harris County; Ewing Boyd, Judge.

Action by R. W. Horlock against the Guardian Trust Company, executor and trustee. From a judgment for defendant on a directed verdict, plaintiff appeals. Reversed and remanded.

Ned B. Morris and Earl Wharton, both of Houston, for appellant.

Baker, Botts, Parker & Garwood, of Houston, for appellee.

WALKER, J. Hugh Hamilton, a citizen of Harris county, Tex., died testate in August, 1922. After providing for the payment of his just debts, funeral expenses, and certain bequests, the fourth paragraph of Mr. Hamilton's will provided:

"All of the rest, residue and remainder of my property, wheresoever situated and of whatever consisting, I will, devise and bequeath to said Guardian Trust Company of Houston, Texas, its successors as hereinafter defined, to have and to hold the same in trust for the persons with the powers and authority, and subject to the terms, conditions and provisions hereinafter set forth.

"The trustee shall have full power to sell, transfer, convey, lease, mortgage, invest, reinvest, control and manage, upon such terms and under such conditions as in its judgment may seem best and proper, all of the property received by it or held in trust, and to do and perform all acts and things touching or concerning the management of said property.

"The trustee shall control, receive and receipt, for all income, rents, gains and profits from and upon the property held in trust, and after paying the expenses of administering the trust, including reasonable compensation, to it for its services, shall pay and distribute the income from, and the principal of the trust estate as follows. * * *"

This provision was followed by directions to the trustee for the payment and disposition of the income of his estate and its ultimate distribution. The seventh and last clause of the will was as follows:

"I name, constitute and appoint Guardian Trust Company of Houston, Texas, executor of my will; and I direct that no, bond shall be required of it as executor, and that no action shall be had in the county court in relation to the settlement of my estate, except to probate and record my will, and to return an inventory, appraisement and lists of claims."

The appellee, Guardian Trust Company, duly probated this will, qualified as executor under its terms, and entered upon the discharge of the duties of trustee, as imposed by the terms of the will. The estate of Hamilton was at all times solvent; being of the reasonable value of more than $1,000,000 in excess of all possible liabilities. At the time of the institution of this suit, most of the claims against the estate had been adjusted, but there remained claims to the extent of nearly $300,000 in the process of adjustment.

During his lifetime, Mr. Hamilton and appellant, Horlock, were close personal friends and business associates. Though they had had many transactions over a long period of years, involving many different enterprises, the evidence shows that all business relations between them had been conducted on a verbal understanding. There was no evi-

⬦For otner cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

dence of a written contract between them involving any business transactions.

In 1921, each of them owned stock in the Central Texas Ice Light & Power Company of Mexia, Tex., a corporation chartered for $300,000, divided into 3,000 shares of the par value of $100 each. Hamilton was the largest stockholder, owning between 1,400 and 1,500 shares of this stock. Horlock owned between 290 and 295½; there being evidence that he owned as much as 295½ shares. In order to acquire a controlling interest in the company, Hamilton, under the terms of a contract with Horlock, took over 290 shares of Horlock's stock. This suit was instituted by appellant against the Guardian Trust Company, executor and trustee, under the terms of the Hamilton will, to adjust the terms of that contract. Appellant alleged that he delivered his stock to Hamilton under the terms of the contract, by which he was allowed $50 per share at the time of the delivery, but when sold by Hamilton he was to have all the excess that the stock might bring above the $50. He further alleged that the stock was sold by appellee, after Hamilton's death, at a net price far in excess of $50, placing it in his pleadings at about $135 per share. He also alleged that appellee held some stock of his on which nothing had been paid by Hamilton, and sought recovery for the full sale price.

For the purposes of this opinion, it is sufficient to say that appellee answered by general denial.

The trial was to a jury, but at the conclusion of the evidence, a verdict was instructed in appellee's favor.

[1] The first question presented for our decision is the ruling of the court refusing appellant permission to testify to the jury the terms of the contract by which he delivered his stock to Hamilton. This ruling was not error, since this evidence was clearly inhibited under the terms of article 3690, Revised Civil Statutes. Appellant sued appellee as executor of the estate of Hugh Hamilton, and also as trustee. Had he been successful, his judgment must have run against appellee as executor. If this stock was the property of the Hamilton estate, it clearly passed to the executor to be administered under the laws of this state, and could not be withdrawn from administration until the debts were adjusted in the manner provided by law. True, certain bequests had been paid, certain profits paid to the beneficiaries under the trust, and appellee had been discharging some of the duties of trustee as required by the will; but, until the administration was closed, appellee, as executor, had the first and primary claim on all property in its hands for the purposes of administration. Because there was an excess above all possible liabilities, appellee could also safely function at the same time as trustee. This,

however, was not an absolute right, since all the assets were primarily subject to the payment of the unadjusted claims. Appellant recognized, and so stated to this court. on oral submission, that no part of the estate held by appellee under the terms of the Hamilton will could be withdrawn from its possession except by a judgment running against it in its character as executor. Now, if appellant's claim was well founded in fact, the effect was to create a trust relation between him and Hamilton. It was held by the Austin Court of Civil Appeals, in Dean v. Dean, 214 S. W. 508, that such contracts constitute "transactions" with decedents within the terms of article 3690. Of course, if appellant's suit had been against appellee solely as legatee or trustee under the will, we would have had an entirely different question before us.

[2] But we think appellant, by the evidence offered on the trial of the case, raised an issue of fact upon which the jury could have found in his favor. J. S. Marshall, in the lifetime of Mr. Hamilton, his confidential man and an officer in many of his business enterprises, testified fully as to the relations between Horlock and Hamilton, the financial condition of the Mexia corporation, its capital stock, and the ownership thereof, and the acquisition by Hamilton of the Horlock stock. He said on this issue, speaking of the time Hamilton delivered to him the Horlock stock for cancellation and reissue:

"I did state that I had worked for Mr. Hugh Hamilton. I had known Mr. Hamilton from the time I began working for him and on up to the date of his death; I was working for him at the time of his death. I continued, after his death, in the employment of some of his companies. I continued up until the time the property was sold, and then I went with the property for a while after that. This certificate No. 6, which was introduced in evidence this morning, shows it was 'canceled 3/30/22, by J. S. Marshall, per E. J. Flake,' was canceled under my orders. At the time it was canceled Mr. Hugh Hamilton, Mr. Flake, and myself were present. Mr. Hugh Hamilton handed me this certificate No. 6 for cancellation, and gave me several other certificates with it, two other certificates—do you want me to continue? At the time Mr. Hamilton handed me these certificates, he stated, 'Have you got the Mexia Company stock book?' I said, 'Yes, sir.' At the time I am now testifying about I was at my office at the Rio Grande Valley Ice Company, McKinney avenue and Shepherd streets; that being one of Mr. Hamilton's companies. Mr. Hamilton said, 'Have you the Mexia Company stock book with you?' I said, 'Yes, sir.' He said, 'Well, will you cancel these certificates I have here and send Mr. Seinsheimer, in Galveston, what his letter calls for, and issue the rest in my name?' I said, 'Yes, sir,' and I did so. At the time this came up, I asked him had he bought those, and he said, 'Yes;' he had made a trade with Bob—meaning Mr. Horlock—involving Mr. Horlock's stock in the Mexia Company and his stock in the Bryan

Ice Company. Then I asked him, 'Did you get out of the Bryan Ice Company entirely?' and he said, 'No.' 'Well,' I said, 'Mr. Horlock has got a little more in here too, has he?' and he said, 'Yes.' I said, 'What did you pay for it, if I may ask?' He said, 'I gave him 50 cents on the dollar, and promised him that, if at any time within six months the property was sold and more was realized from it, I would give him the difference'—that is, he would give the difference to Mr. Horlock, over 50 cents on the dollar."

Mr. John Henry Kirby of Houston testified that he knew both Horlock and Hamilton, and that they were all good friends. He testified to one unfortunate business venture in which all of them were interested, and which resulted in a heavy loss to Horlock as well as to himself and Hamilton. He further testified:

"I did see Mr. Hamilton in Mexia, Tex., some time before his death, but I cannot tell you exactly what the date was; it was either in the latter part of 1921 or early part of 1922. [The witness is shown a deposition formerly given by him in this case.] What I meant in this deposition where I said there was some document I wanted to refer to—and this seems to be some deposition I gave in this case—what I meant was, I wanted to look up to see the proper dates on which I went to Mexia, three times during that period; they being, the first one, in September, one in November, and another in January, 1922, and that is the one I fix as the time I had the conversation with Mr. Hamilton. At the times I went to Mexia I was inspecting that oil field. I saw Hugh there two or three times while I was up there, or maybe more frequently than that; once he was out there on a lease out there that Mr. Nussbaum was interested in. Hugh and Mr. Nussbaum were great friends. I did have some conversation with Mr. Hamilton, in Mexia, concerning Bob Horlock, but just when, as to the particular month or period, I do not know. I do not know now whether it was in November, 1921, or January, 1922; but it was on one of my visits to Mexia that I had such conversation with him. I only made three trips there—one in September, one in November, and another in January, 1921—and it was on one of the last two I made up there that I had the conversation with him; I am sure it was not on the trip I made there in September, because I was out on the lease all that day. So that that would reduce it down to November or January, 1921, that I had the conversation with Mr. Hamilton. I will have to tell the jury a little bit antecedent to tell just how that conversation came up about, and how it was: Mr. Horlock and Hugh had been interested with me in the ice plant at Silsbee. Bob was manager—Mr. Horlock I mean. Later, I bought them out, and it was a little disappointing to Bob, but that is neither here nor there. So I inquired of Hugh about Bob, because I knew their intimate relations; they were in many things together, as I had understood, as both of them had told me— ice plants and light plants all the way from North Texas to the Rio Grande Valley, including some East Texas plants, and especially ours at Silsbee. I hadn't seen Bob in months, I don't know how many, but quite a term of

months, and I was interested to inquire about him, and I inquired of Hugh as to how he was getting along (in speaking of Hugh, I mean Mr. Hamilton), knowing their intimate relations, and he said that Bob was doing well, and that if he carried the plans he had for the development of their plant in Mexia, which required, as he told me, quite a large expenditure, and which, for its success, was dependent largely upon that oil field. That, perhaps more than anything else, influenced Hugh to inquire of me because he thought I knew a little more about oil fields than I do—at any rate, if he carried the plans that he then had under way, and the construction of some additions to their plant up there which he then contemplated, or perhaps had under way, Bob would make an awful good thing out of his investment in that plant. He was talking about the ice plant, or light plant, I don't know which, or maybe both, in Mexia, the plant he owned there at that time, that Hugh was developing at that time. I think Mr. Nussbaum, our mutual friend, was president of it probably; I think so; I think Hugh told me that. Hugh was inquiring of me about what I thought of that oil field, and in the conversation I inquired of him about the welfare of Bob Horlock; well, I had already inquired of him about Bob, then Hugh asked me what I thought of the extent of that oil field and its permanency. Mr. Hamilton's statement to me, in substance, was that Bob would have a mighty good thing which would compensate him for all the disappointments—I had referred to this Silsbee matter—all of the disappointments he had recently had. There was no reference by Mr. Hamilton as to any number of years or days or months it was to be."

This conversation with Hamilton was after Horlock had delivered his stock to Hamilton.

J. P. Tooke testified: 

"My name is J. P. Tooke. I am 48 years old. * * * I did know Hugh Hamilton during his lifetime; I had known him ever since I had been in Houston; he was the first man I met here. I have worked for Mr. Hamilton; I worked for him off and on through 20 years. * * * I was, some time during the year 1921, incapacitated for work; I got my arm broke, I think along about the 3d day of August, 1921; I got it broke cranking an automobile. I was not working directly for Mr. Hamilton at the time I got my arm broke. I was incapacitated for work as a result of that accident for some three or four months. After I got up on my feet I dropped down town one day to see Mr. Hamilton, because I had something else in view, and I met him and told him what I had in view, and I asked him if he had anything he wanted me to do, and he says, 'Well, all that I have got that is bothering me now is Mexia.' That conversation with Mr. Hamilton took place somewhere in the latter part of December, 1921, during the month of December, 1921; it was after the 1st of December before I was able to get out at all or even get around. The conversation with Mr. Hamilton, about which I am testifying, started on the sidewalk in front of his office at the Houston Ice & Brewing Association. I mean I met him there as he was getting out of his car and spoke to him—he stopped and spoke to me. Mr. Hamilton was a man you had to speak to right now if

you were going to talk to him at all. We did not finish our conversation on the sidewalk; we went to his office. He said, 'Come on up to my office.' We did discuss the Mexia plant further then. Mr. Hamilton said, 'All I have got that is bothering me now is the Mexia plant, and I don't know just how quick I am going to do anything, but,' he says, 'my idea is, I want you to go up there and work with Bob,' meaning Bob Horlock; he always called him 'Bob.' I did know Bob Horlock. I didn't know the nature of the work Mr. Hamilton wanted me to do or anything, and I said, 'Mr. Hamilton, has Mr. Horlock got anything?' and he said, 'Yes; I wish you were just as well fixed as he,' and he says, 'He has got a large holding in the Mexia plant; in fact, I am holding his stock now; I am trying to make a sale of the Mexia plant,' in some way, I can't remember now just exactly how that came up, and he said, 'I am holding that to protect Bob.' "

Joseph Nussbaum testified that after Horlock had delivered his stock to Hamilton, he offered $60 per share for 100 shares; that he spoke to Hamilton about it, and Hamilton said "he could not sell that stock, that there was a string tied to it." He testified further that Horlock told him that he and Hamilton had made a trade whereby he was getting 50 cents on the dollar for his stock, and, if he could get more in a specified time, that Hamilton would give him more, but no time was mentioned.

Again, quoting from the testimony of the witness Marshall:

"I have attended meetings of the directors of the Mexia company; I attended one of them at Galveston. It was either in January or February of 1922, that I attended the last meeting of the directors of the company in Galveston. That meeting was held at the residence of Mr. Joseph Nussbaum, 1710 Post Office avenue, in Galveston. Mr. Joseph Nussbaum was president at that time. Joseph Nussbaum had been president. Mr. Joseph Nussbaum was a very elderly gentleman. Mr. Hugh Hamilton did attend the meeting to which I have just referred; so did Mr. R. W. Horlock. Mr. Hamilton and Mr. Horlock did have a conversation about these Mexia properties at that meeting. That conversation was—the directors were to be voted on—and Mr. Hamilton asked Mr. Horlock to be a member of the board of directors. Mr. Horlock's reply to that was that he was too busy, and then some other conversation. Mr. Hamilton did give a reason as to why he asked Mr. Horlock to remain on the board of directors; his reason he gave was that he [Horlock] was interested in there; that he had been acquainted with all those people around Mexia and he wanted him to be on the board of directors. That conversation occurred at the meeting that I have just told you about. That was the last annual meeting of the stockholders before Mr. Hamilton's death."

After the trade with Hamilton, Horlock contracted to sell 16 shares of his Mexia stock to the Adoue estate at Galveston, with the understanding that this was to be delivered from the stock held by Hamilton, but for a long time Hamilton delayed the delivery of this stock. Finally, however, Horlock gave to his vendee a written order, directed to Hamilton, and requested him to deliver the 16 shares of stock, which, after some weeks, was duly recognized by Hamilton, and he instructed Marshall to issue and deliver the 16 shares, as directed in the order. It was clearly shown by the evidence that Horlock's stock was never worth as little as $50 per share from and after the beginning of negotiations between him and Hamilton, but the issue was clearly raised that its cash market value was at all times from $60 to or above $75 per share. After Hamilton acquired the Horlock stock, he made extensive improvements in the plant, bonding it for very large sums of money. After his death, appellee sold the plant for $660,000, which, after paying all liabilities, left a net surplus for the stockholders of $142 per share. Other offers were made for the property during Hamilton's lifetime, and also after his death, but these offers were very much less than the price at which the property was subsequently sold. It is not shown that Hamilton had an offer for the property during his lifetime that would have netted the stockholders very much, if anything, in excess of the cash value of the stock as above indicated. There is no evidence as to the exact date of the contract between Horlock and Hamilton, but the issue was raised that it was in the early part of the fall of 1921, at a period probably 6 months previous to the date when Hamilton delivered the old stock to Marshall for cancellation. Also the issue was raised that, if Kirby had his conversation with Hamilton in January, 1922, the improvements made subsequently in the Mexia property could not have been completed within the 6 months' period.

From this evidence it is clear that Hamilton did not acquire the absolute title to Horlock's stock, but held it in trust for his benefit, subject to a future adjustment. The only question for us to determine is whether the issue was raised that Horlock's interest was to be forfeited at the expiration of 6 months, or whether Hamilton was to give him the profit when the stock was sold, without reference to any time limit.

Under Hamilton's statement to Kirby, he was not holding the Horlock stock for immediate or early sale, but that Horlock might have the benefit of the improvements then and thereafter to be made. The issue reasonably appears that those improvements could not have been completed within the 6 months' period. Also it appears from this testimony that a sale of the stock, while netting appellant a substantial sum, would not have been to his advantage to the extent indicated by what Hamilton said to Kirby, nor by what Hamilton said to his friend Tooke. Again, by recognizing the order given by Horlock, directing him to deliver 16 shares

to the Adoue estate, the issue was raised that Hamilton was not claiming the absolute title to all the stock, but recognized Horlock as the owner thereof. When he requested Horlock to go on the board of directors of the Mexia Corporation, his request and what was said at the time raised an inference that Horlock had a very substantial interest in the corporation, more than would necessarily be implied by the 5½ shares which appear to have been in his name on the books. Again, it appears that Horlock could have sold his stock at a substantial price above the $50 per share within the 6 months' period, and did not do it. Why? If Horlock had only 6 months in which to sell his stock, there is absolutely no explanation of his failure to sell and realize the profit above the $50 paid him by Hamilton at the time of its delivery. Again, when Nussbaum offered to buy the Horlock stock from Hamilton, to quote again from Nussbaum's testimony, "Mr. Hamilton told me that he couldn't sell the stock—that there was a string to it." The court should have submitted the appellant's theory of the case to the jury.

Appellant insists that the issue was raised that he owned absolutely 11½ shares of the stock, in which theory of the case we concur. But, since the case is to be reversed, for the reasons already given, it is not necessary to review the evidence on this least important issue.

Reversed and remanded.